UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JANE DOES 1-10, et al., | CASE NO. C16-1212JLR |
| Plaintiffs, | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER REISSUING PRELIMINARY INJUNCTION |
| v. | |
| UNIVERSITY OF WASHINGTON, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Before the court is the August 22, 2017, order of the United States Circuit Court of Appeals for the Ninth Circuit reversing and remanding this court's order granting Plaintiffs Jane Does 1-10 and John Does 1-10's (collectively, "Doe Plaintiffs") motion for a preliminary injunction.  (*See* USCA Order (Dkt. # 113); *see also* PI Order (Dkt. # 88).)  The Ninth Circuit further ordered that the court's "preliminary injunction shall remain in place for a reasonable time not to exceed 120 days to allow the district court to

enter necessary findings of fact and conclusions of law supporting injunctive relief."[1] (USCA Order at 4.)  Following entry of the Ninth Circuit's order, the court ordered the parties to file supplemental memoranda responding to the Ninth Circuit's guidance.  The court has considered the parties' supplemental briefing and related submissions (Pl. Supp. Br. (Dkt. # 119); UW Supp. Br. (Dkt. # 120); Def. Supp. Br. (Dkt. # 122); Pl. Supp. Reply (Dkt. # 123); Pl. Not. Supp. Auth. (Dkt. # 124); Pl. 2d Supp. Br. (Dkt. # 127); UW 2d Supp. Br. (Dkt. # 126); Def. 2d Supp. Br. (Dkt. # 128)), the relevant portions of the record, and the applicable law.  In addition, the court heard the argument of counsel on November 29, 2017.  (*See* 11/29/17 Min. Entry (Dkt. # 129).)  Being fully advised, the court reissues the preliminary injunction as more fully described below.[2]

## II.    BACKGROUND

On February 9, 2016, Defendant David Daleiden issued a request to Defendant University of Washington ("UW") under Washington State's Public Records Act

---

[1] December 12, 2017, is 120 days from the date on which the Ninth Circuit entered its order.  (*See* USCA Order at 4.)

[2] In accordance with Federal Rules of Civil Procedure 52(a) and 65(d), this order shall constitute the court's findings of fact and conclusions of law setting forth the grounds for the reissuance of the preliminary injunction.  *See* Fed. R. Civ. P. 52(a); Fed. R. Civ. P. 65(d); *see also A. H. R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *1 n.4 (W.D. Wash. Jan. 7, 2016).  Although the court has not labeled paragraphs specifically as findings of fact or conclusions of law, such labels are not necessary.  The nature of the findings and conclusions that follow is apparent.  *See Tri–Tron Int'l v. A.A. Velto*, 525 F.2d 432, 435-36 (9th Cir. 1975) ("We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it. . . . [T]he findings are sufficient if they permit a clear understanding of the basis for the decision of the trial court, irrespective of their mere form or arrangement") (citations omitted); *In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions of law.").

("PRA"), RCW ch. 42.56, seeking to "inspect or obtain copies of all documents that relate to the **purchase, transfer, or procurement of human fetal tissues**, human fetal organs, and/or human fetal cell products at the [UW] Birth Defects Research Laboratory from **2010 to present**." (Power Decl. (Dkt. # 5) ¶ 4, Ex. C (bolding in original).) On February 10, 2016, Defendant Zachary Freeman issued a similar PRA request to UW.[3] (*Id.* ¶ 6, Ex. E.) Among other documents, these PRA requests sought communications between UW or its Birth Defects Research Laboratory ("the Lab"), on the one hand, and Cedar River Clinics ("Cedar River"), Planned Parenthood of Greater Washington and North Idaho, or certain individuals or employees of Cedar River and Planned Parenthood of Greater Washington and North Idaho, on the other hand. (*Id.* at 1; *see also id.* ¶ 4, Ex. C at 1-2.) Mr. Daleiden's PRA request specifically lists the names of eight such individuals. (*Id.* ¶ 4, Ex. C at 1-2.)

On July 21, 2016, UW notified Doe Plaintiffs that absent a court order issued by August 4, 2016, it would provide documents responsive to Mr. Daleiden's PRA request without redaction at 12:00 p.m. on August 5, 2016. (Does 1, 3-4, 7-8 Decls. (Dkt. ## 6, 8-9, 12-13) ¶ 3, Ex. A; Doe 5 Decl. (Dkt. # 10) ¶ 3; Doe 6 Decl. (Dkt. # 11) ¶ 5, Ex. A.) On July 26, 2016, UW issued a similar notice to Doe Plaintiffs regarding Mr. Freeman's

//

//

//

---

[3] On December 27, 2016, the court entered a stipulated order dismissing Mr. Freeman from the lawsuit. (Stip. Ord. of Dismissal (Dkt. # 105).)

request and indicated that, absent a court order, UW would provide responsive documents

without redaction on August 10, 2016.[4]  (Does 1, 3-4 Decls. ¶ 4, Ex. B.)[5]

On August 3, 2016, Doe Plaintiffs filed a complaint on behalf of a putative class

seeking to enjoin UW from issuing unredacted documents in response to the PRA

requests.  (Compl. (Dkt. # 1).)[6]  Doe Plaintiffs object to disclosure of the requested

documents in unredacted form because the documents include personally identifying

information such as direct work phone numbers, work emails, personal cell phone

numbers, and other information.  (*See* TAC (Dkt. # 77) at 2 ("Doe Plaintiffs . . . seek to

have their personal identifying information withheld to protect their safety and privacy.");

*see also, e.g.*, Doe 5 Decl. ¶¶ 4-5 ("Any email contacts I had with [the Lab] would have

highly personal information such as my name, email address, and phone number. . . . My

name, email address, and phone number are information that I try to keep private when

related to where I work.").)

//

---

[4] Under RCW 42.56.540, "[a]n agency has the option of notifying persons named in the record or to whom a record specifically pertains" prior to disclosure.

[5] Jane Doe 2 omitted exhibits from her declaration, but the other Doe declarations sufficiently demonstrate that UW issued similar letters to the individuals implicated in the relevant PRA request.

[6] Doe Plaintiffs also filed an amended complaint and a second amended complaint on August 3, 2016.  (*See* FAC (Dkt. # 22); SAC (Dkt. # 23).)  Doe Plaintiffs' amended complaint amends allegations concerning jurisdiction and venue.  (*Compare* Compl. ¶¶ 17-18 (alleging jurisdiction under RCW 2.08.010 and RCW 4.28.020 and venue under RCW 42.56.540), *with* FAC ¶¶ 17-18 (alleging jurisdiction under 28 U.S.C. § 1331 and venue under 28 U.S.C. § 1391(b)(2)).)  Doe Plaintiffs' second amended complaint corrects what appear to be typographical errors in paragraph 18 of the amended complaint relating to venue.  (*Compare* FAC ¶ 18, *with* SAC ¶ 18.)

On the same day that they filed suit, Doe Plaintiffs filed a motion seeking both a temporary restraining order ("TRO") and a preliminary injunction against disclosure of the requested documents.[7]  (*See* TRO/PI Mot. (Dkt. # 2).)  In addition, Doe Plaintiffs filed a motion for class certification.  (*See* MFCC (Dkt. # 16).)  Doe Plaintiffs ask the court to certify a class consisting of "[a]ll individuals whose names and/or personal identifying information (work addresses, work or cell phone numbers, email addresses) are contained in documents prepared, owned, used, or retained by UW that are related to fetal tissue research or donations."  (*Id*. at 2.)

On August 3, 2016, the court granted Doe Plaintiffs' motion for a TRO but set the TRO to expire on August 17, 2016, at 11:59 p.m.  (TRO (Dkt. # 27) at 7.)  The court restrained UW "from releasing, altering, or disposing of the requested documents or disclosing the personal identifying information of Plaintiffs pending further order from this court."  (*Id*. at 7.)  On August 17, 2016, the court extended the TRO "until such time as the court resolves [Doe] Plaintiffs' pending motion for a preliminary injunction." (8/17/16 Order (Dkt. # 54) at 2.)

On November 11, 2016, the court granted Doe Plaintiffs' motion for a preliminary injunction.[8]  (PI Ord. (Dkt. # 88).)  The court concluded that Doe Plaintiffs were likely to

---

[7] On the same day, Doe Plaintiffs also filed a motion to proceed in pseudonym. (MTPP (Dkt. # 15).)  Defendants did not oppose the motion (*see generally* Dkt.), and the court granted it on August 29, 2016 (8/29/16 Order (Dkt. # 68)).

[8] Before the court could resolve Doe Plaintiffs' motion for a preliminary injunction, Mr. Daleiden filed a motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction.  (*See* MTD (Dkt. # 49).)  On October 4, 2016, the court granted Mr. Daleiden's motion and dismissed Doe Plaintiffs' second amended complaint without prejudice for lack of subject matter jurisdiction.  (10/4/16 Order (Dkt. # 76) at 12-14.)  The court also granted Doe

succeed on the merits of their claim that disclosure of their personally identifying information would render them and those similarly situated uniquely vulnerable to harassment, shaming, stalking, or worse, and in this context, would violate their First Amendment rights to freedom of expression and association. (*Id.* at 18-19.) Thus, the court also concluded that Doe Plaintiffs were "likely to succeed on the merits of their claim that their personally identifying information is exempt from disclosure under the PRA." (*Id.* at 19.) After finding that the remaining factors—irreparable injury, the public interest, and the balance of equities—also favored preliminary injunctive relief, the court granted Doe Plaintiffs' motion but narrowed the scope of the injunctive relief it granted as compared to the relief granted in the TRO. (*See id.* at 19-22, 25.)

In the preliminary injunction, the court did not prohibit the release of the documents at issue but rather enjoined UW from releasing the requested documents without first redacting all personally identifying information or information for Doe Plaintiffs from which a person's identity could be derived with reasonable certainty. (*Id.* at 19-21, 25.) Specifically, the court held that the UW was required to redact all personally identifying information, including but not limited to (a) information that identifies or provides the location of an individual, (b) information that would allow an

---

Plaintiffs leave to file a third amended complaint that remedied the jurisdictional deficiencies identified in the court's order. (*Id.* at 14-18.) Doe Plaintiffs timely filed their third amended complaint on October 18, 2016 (*see* TAC), and the court concluded that Doe Plaintiffs' third amended complaint satisfied the directives of its October 4, 2016, order with respect to subject matter jurisdiction (PI Order at 5). Doe Plaintiffs' third amended complaint also added Defendant Perry Tapper, who is a records compliance officer in UW's Office of Public Records and Open Meetings ("OPR"). (*See* TAC ¶ 12; Supp. Tapper Decl. (Dkt. # 121) ¶ 2.) The court refers to UW and Mr. Tapper collectively as "UW."

individual to be identified or located, (c) information that would allow an individual to be contacted, (d) names of individuals, (e) phone numbers, (f) facsimile numbers, (g) email and mailing addresses, (h) social security or tax identification numbers, and (i) job titles. (*Id.* at 25-26.)

On December 15, 2016, Mr. Daleiden filed a notice appealing "the district court's grant of a preliminary injunction prohibiting disclosure of 'all personally identifying information or information from which a person's identity could be derived with reasonable certainty.'" (*See* USCA Order at 2 (quoting PI Order at 25); *see also* Not. of App. (Dkt. # 98).) On January 4, 2017, this court stayed proceedings at the district court level, except for purposes of enforcing and administering the preliminary injunction, pending the resolution of Mr. Daleiden's appeal. (1/4/17 Min. Entry (Dkt. # 109).) On August 14, 2017, the Ninth Circuit reversed and remanded the court's preliminary injunction order but nevertheless left the preliminary injunction in place for 120 days "to allow the district court to enter the necessary findings of fact and conclusions of law supporting injunctive relief." (USCA Order at 4.)

In its August 14, 2017, order, the Ninth Circuit stated that "[t]o prevail on the First Amendment claim, . . . Doe Plaintiffs must show that particular individuals or groups of individuals were engaged in activity protected by the First Amendment and 'show "a reasonable probability that the compelled disclosure of personal information will subject"' those individuals or groups of individuals 'to threats, harassment, or reprisals' that would have a chilling effect on that activity." (USCA Order at 3 (citing *John Doe No. 1 v. Reed*, U.S. 186, 200 (2010) and quoting *Buckley v. Valeo*, 424 U.S. at 1, 74

(1976) (brackets omitted)) (footnote omitted).)  The Ninth Circuit agreed "that there may

be a basis for redaction where disclosure would likely result in threats, harassment, and

violence," but determined that "the [district] court's order did not address how the Doe

Plaintiffs have made the necessary clear showing with specificity as to the different

individuals or groups of individual who could be identified in the public records."  (*Id.*)

The Ninth Circuit also determined that this court "made no finding that specific

individuals or groups of individuals were engaged in activity protected by the First

Amendment and what that activity was."  (*Id.* at 3-4.)  Accordingly, the court remanded

the proceeding "to address how disclosure of specific information would violate the

constitutional or statutory rights of particular individuals or groups."  (*Id.* at 4.)

Pursuant to the court's preliminary injunction, UW produced redacted records to

Mr. Daleiden in two stages and completed its production on September 8, 2017.  (*See*

Supp. Tapper Decl. (Dkt. # 121) ¶¶ 3-14.)  Stage 1 of the production of documents

consisted of 1,678 pages, and stage 2 consisted of 3,489 pages.  (*Id.* ¶¶ 5, 14.)

Meanwhile, on August 22, 2017, the court lifted its prior stay and ordered Doe

Plaintiffs, UW, and Mr. Daleiden to file supplemental memoranda responding to the

Ninth Circuit's guidance.  (*See* 8/22/17 Order (Dkt. # 114) at 1 n.1, 4-5.)  The court

received the parties' supplemental submissions and now considers whether to reissue,

modify, or terminate the preliminary injunction based on the Ninth Circuit's guidance

and the applicable law and facts.

//

//

# III.    ANALYSIS

## A.    Standard for Granting a Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). To obtain such relief, "[a] plaintiff . . . must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "A plaintiff must make a showing as to each of these elements, although in [the Ninth Circuit] 'if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Feldman*, 843 F.3d at 375 (quoting *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1282, 1291 (9th Cir. 2013)). "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1135 (9th Cir. 2001).

The Ninth Circuit's order does not call into question the court's conclusions with respect to the last three *Winter* factors—irreparable harm, the balance of the equities, and the public interest—which the court found weighed in favor of issuing the preliminary

injunction. (*See generally* USCA Order.) Rather, the infirmities identified by the Ninth

Circuit relate to Doe Plaintiffs' likelihood of success on the merits. As instructed by the

Ninth Circuit, the court will begin its analysis by "address[ing] how disclosure of specific

information would violate the constitutional or statutory rights of particular individuals or

groups" of Doe Plaintiffs. (*See* USCA Order at 4.)

**B.     The Likelihood of Success on the Merits**

In their first supplemental brief following remand, Doe Plaintiffs urge the court to

find that the personally identifying information of Doe Plaintiffs found in the subject

documents is protected both on First Amendment and privacy grounds. (Pl. Supp. Br. at

1-3.) Mr. Daleiden argues that because the Ninth Circuit's remand order addressed only

First Amendment issues, Doe Plaintiffs' "privacy claim is dead." (*See* Def. Supp. Br. at 2

n.2; *see also* USCA Order.) The court disagrees. Although Doe Plaintiffs raised their

privacy rights as an alternate ground for a preliminary injunction in their motion (TRO/PI

Mot. at 8-11), and Mr. Daleiden responded (Def. PI Resp. (Dkt. # 50) at 7-10)), the

court's preliminary injunction relied solely on Doe Plaintiffs' First Amendment

expression and associational rights (*see generally* PI Order).[9] Thus, the Ninth Circuit has

---

[9] Mr. Daleiden asserts that the court's preliminary injunction "cited privacy as an alternative basis for a preliminary injunction." (Def. Supp. Br. at 2 n.2 (citing PI Order at 19).) The court refers to the word "privacy" in the concluding paragraph of the section of the order devoted to analyzing Doe Plaintiffs' First Amendment expression and associational rights. (*See* PI Order at 19.) Privacy cannot be said to be "an alternative basis" for the court's preliminary injunction based on this singular reference. The court did not intend its order to be so construed; and neither did the Ninth Circuit so construe it. (*See* USCA Order at 2 ("The district court relied on a blanket finding that the entire putative class was engaged in protected First Amendment activity.").) If anything, the court's reference to privacy in the context of its discussion of Doe Plaintiffs' First Amendment rights was simply a recognition that the "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of

not yet ruled on the privacy issue nor terminated Doe Plaintiffs' privacy claim as Mr.

Daleiden asserts. (*See id.*) In addition, a recent Washington Court of Appeals decision—

issued after the Ninth Circuit's remand order—is relevant to Doe Plaintiffs' assertion of

constitutional privacy rights in the personally identifying information at issue here. (*See*

Pl. Not. of Supp. Auth. at 1 (citing *Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for*

*Childhood Deafness & Hearing Loss*, 404 P.3d 111 (Wash. Ct. App. 2017)).) The court

directed the parties to submit supplemental briefs on this decision and has considered the

parties' submissions. (*See* 11/20/17 Order (Dkt. # 125); Pl. 2d Supp. Br.; UW 2d Supp.

Br.; Def. 2d Supp. Br.) Accordingly, on remand, the court will address not only the

issues raised by the Ninth Circuit concerning Doe Plaintiffs' First Amendment expressive

and associational rights, but also Doe Plaintiffs' assertion of a right of privacy under

Washington State's Constitution.

    1. <u>The First Amendment</u>

    The PRA enumerates a variety of express exemptions. *See* RCW ch. 42.56. The

PRA also incorporates an "other statute" exemption where such a statute imposes

confidentiality obligations or prohibits the disclosure of specific information or records.

RCW 42.56.070(1);[10] *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 888 P.2d 592,

---

association." *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

[10] RCW 42.56.070(1) states:

    Each agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of subsection (8) of this section, this chapter, or other statute which exempts or prohibits disclosure of specific information or records. To the extent

602 (Wash. 1994). The Washington State Supreme Court has construed the "other statute" exemption to include exemptions grounded in either the state or federal constitutions. *Freedom Found. v. Gregoire*, 310 P.3d 1252, 1258 (Wash. 2013.)

In its remand order, the Ninth Circuit stated that "[t]o prevail on their First Amendment claim, the Doe Plaintiffs must show that particular individuals or groups of individuals were engaged in activity protected by the First Amendment and 'show "a reasonable probability that the compelled disclosure of personal information will subject"' those individuals or groups of individuals 'to threats, harassment, or reprisals' that would have a chilling effect on that activity." (USCA Order at 3 (quoting *Reed*, 561 U.S. at 200 (2010) and *Buckley*, 424 U.S. at 74 (1976) (brackets omitted)) (footnote omitted).) In response to the Ninth Circuit's remand order, Doe Plaintiffs assert that they consist of three groups of individuals engaged in First Amendment protected activity. (*See* Pl. Supp. Br. at 3.) Thus, the court first addresses whether these groups engaged in First Amendment activity and then turns to whether they would be subject to threats, harassment, or reprisals if their personal information is disclosed.

The first group of Doe Plaintiffs includes "[a]dvocates, [p]ractitioners, and [s]taff" "who advocate through speech or conduct, for organizations and/or entities that provide abortions and/or make available fetal tissue for medical research, including individuals who in fact participated in the procurement of fetal tissue for medical research purposes

---

required to prevent an unreasonable invasion of personal privacy interests protected by this chapter, an agency shall delete identifying details in a manner consistent with this chapter when it makes available or publishes any public record; however, in each case, the justification for the deletion shall be explained fully in writing.

and/or arranged for the delivery of fetal tissue to the Lab, and staff associated with the same." (*Id.*.)  This group includes John Doe 1, who is an employee of Seattle Children's Hospital, and Jane Does 3-7, who are employees (or former employees) of Planned Parenthood of Greater Washington and North Idaho, Planned Parenthood Federation of America, Cedar River, Evergreen Hospital Medical Center, and UW ("Group 1").  (*Id.* at 3 n.3; *see also* Does 1, 3-7 Decls. ¶ 1.)  The second group includes "Lab staff," who "facilitate[] the collection and/or dissemination of fetal tissue for medical research purposes, and staff associated with the same."  (Pl. Supp. Br. at 3.)  This group includes Jane Doe 2, who is an employee of UW ("Group 2").  (*Id.* at 3 n.4; Doe 2 Decl. ¶ 1.)  The third group includes "[r]esearchers and [s]taff," "whose efforts contribute to medical research that uses fetal tissue obtained from the Lab, and staff associated with the same." (Pl. Supp. Br. at 3.)  This group includes Jane Does 7 and 8, who are both employees of UW ("Group 3").  (*Id.* at 3 n.5; Does 7-8 Decls. ¶ 1.)

Doe Plaintiffs argue that the release of documents pursuant to Mr. Daleiden's PRA request without first redacting the personally identifying information of Doe Plaintiffs in all three groups would violate their First Amendment rights of association and expressive activity, including both advocacy and research.[11]  (*See* Pl. Supp. Br. at 1.)  There is no

---

[11] Mr. Daleiden argues that, except for the names of the eight identified individuals, he "has not asked for the inclusion of names" in his public records request and the court, therefore, should not rule on the issue.  (Def. Supp. Br. at 1 n.1.)  Mr. Daleiden bases this argument on his attorney's communication with UW that he would agree to certain enumerated redactions in the responsive documents.  (*See* Trissell Decl. (Dkt. # 44) Ex. B.)  But Mr. Daleiden fails to provide any evidence that UW modified its notice to Doe Plaintiffs that, absent an injunction, documents reflecting their identities or personally identifying information will be released.  Further, there is no evidence that UW has accepted, or is legally bound to honor, any voluntary limits absent a court order.  (*See generally id.*)  Indeed, Mr. Daleiden provides no legal authority in his briefing

dispute that advocacy and research tied to women's reproductive rights and fetal tissue have become highly politicized topics. As Mr. Daleiden has acknowledged, "the debate over fetal tissue has raged across the country, extending all the way to both parties' presidential primaries, has generated Congressional and other legislative investigations, and still garners much media attention." (Def. Resp. (Dkt. # 50) at 9 (citing Daleiden Decl. (Dkt. # (50-1).) Thus, Doe Plaintiffs posit that supporting an entity that advocates for or enables the availability of women's reproductive health services or fetal tissue research is without doubt First Amendment activity, as is performing the actual underlying academic or scientific research related to such tissue. (Pl. Supp. Br. at 5-8.) They argue that individuals who associate with these organizations and provide the support and labor these protected activities are entitled to the same First Amendment protections as the organizations for which they work. (*See id.*) They assert that their work—even as support staff—is inseparable from the First Amendment protected activity of the organizations with whom they work or otherwise associate. (*Id.* 8-9.) Based on the court's review of Supreme Court and Ninth Circuit precedent, the court agrees with Doe Plaintiffs' position as detailed below.

//

//

indicating that he may decide the types of redactions UW should impose after receipt of a public records request, and he could provide no such authority in response to the court's inquiries at oral argument. Further, the redactions to which Mr. Daleiden agreed and those sought by Doe Plaintiffs concerning their personally identifying information are not coterminous. For all these reasons, the redaction of both names and other personally identifying information remains at issue before this court.

### a. Group 1 – Advocacy

The Doe Plaintiffs in Group 1 are or have been employees of entities that either (1) advocate for access to reproductive health care services such as abortion,[12] and/or (2) partner with, collaborate with, or donate to the Lab to further scientific and medical research involving fetal tissue.[13] These entities, and the individuals who work with and support them, aid in the advocacy for continued access to abortion and reproductive rights (which makes fetal tissue available to researchers) and/or the continued ability to conduct the fetal tissue research itself.

An individual engages in protected First Amendment activity by supporting an expressive or advocacy organization. *See Nat'l Ass'n for Advancement of Colored People*, 357 U.S. at 462 (protecting the identities of NAACP members and "recogniz[ing] the vital relationship between freedom to associate and privacy in one's associations."). Indeed, the First Amendment protects Doe Plaintiffs who advocate for lawful programs

---

[12] (*See, e.g.*, Power Decl. (Dkt. # 5) Ex. I ("The mission of Planned Parenthood of Greater Washington and North Idaho is to provide exceptional reproductive and complementary health care services, honest education, and fearless advocacy for all."); Doe 3 Decl. ¶ 1 (employee of Planned Parenthood of Greater Washington and North Idaho); Cantrell Decl. (Dkt. # 4) ¶ 2 ("As a reproductive health provider since 1979, Cedar River Clinics and its employees have fought for reproductive freedom."); Doe 5 Decl. ¶ 1 (employee of Cedar River Clinics).)

[13] (*See* Doe 1 Decl. ¶ 11 (stating that Seattle Children's Hospital has worked on five to six cases in which the patient consented to fetal tissue donation to the Lab); Doe 3 Decl. ¶ 7 (former Planned Parenthood Federal of America employee whose highly personal information, such as name, email address, and cell phone number, was provided to the Lab); Doe 5 Decl. ¶ 4 (stating that, as part of her work at Cedar Rivers Clinic, she has contacted the Lab to "coordinate the donation of tissue by our clients"); Doe 6 Decl. ¶ 4 ("Evergreen [Hospital Medical Center] coordinates with the [Lab] in its collection of fetal tissue for research purposes. . . . In my role as a genetic counselor, I have had communications with the Lab to coordinate the collection or transportation of fetal tissue to the Lab for processing."); Doe 7 Decl. ¶ 5 ("Through my work, I collaborate with the [Lab] in several capacities.").)

that provide abortions and allow such patients to donate fetal tissue for scientific

research, as well as Doe Plaintiffs who associate with those organizations that further

abortion rights as well as fetal tissue research and advocacy. *See Planned Parenthood*

*Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016) (associating with organizations

for social, political, and educational reasons that provide abortion services and that

participate in lawful programs to allow abortion patients to donate fetal tissue for

scientific research is protected First Amendment activity).[14] Thus, the court finds and

---

[14] Mr. Daleiden misconstrues *Herbert*. (*See* Def. Supp. Br. at 4-5.) Mr. Daleiden argues that *Herbert* "implies that fetal tissue procurement is *not* First Amendment-protected activity, and that it is categorically distinct from 'advocacy.'" (*Id.* at 5 (italics in original).) Mr. Daeliden's position, however, presents a classic "strawman." The plaintiff in *Herbert* did not assert a First Amendment right in fetal tissue procurement and neither do Doe Plaintiffs here. Instead, the plaintiff in *Herbert* asserted "that its 'association with other Planned Parenthood providers who participate in *lawful* programs that allow abortion patients to donate fetal tissue for scientific research . . . is protected by the First Amendment.'" *Herbert*, 828 F.3d 1258 (quoting the *Herbert* plaintiff's motion for a preliminary injunction) (emphasis added). Similar to Mr. Daleiden's argument here, the defendants in *Herbert* misconstrued the plaintiff's arguments by stating that "no court has ever held that the 'fundamental right to abortion includes the right to sell fetal tissue.'" *Id.* at 1259 (quoting the *Herbert* defendants' brief). The *Herbert* defendants also misconstrued the plaintiff's position by arguing that "no court has 'extend[ed] th[e] First Amendment right of association to encompass the right to associate in furtherance of *illegal* acts such as selling fetal tissue.'" *Id.* (quoting the *Herbert* defendants' brief) (brackets in original and italics added). The *Herbert* court responded by stating that defendants' arguments "miss[ed] the mark" because the plaintiff "never alleged that it possessed or exercised any such rights." *Id.* Neither have Doe Plaintiffs here alleged that they possess constitutional rights to sell fetal tissue or associate in the furtherance of illegal acts. Instead, consistent with the plaintiff's position in *Herbert*, Doe Plaintiffs assert that "[t]he threat of exposure of [their] personally identifying information would discourage their participation with organizations such as Planned Parenthood and Cedar River Clinics, and their willingness to cooperate with . . . the Lab . . . and other state agencies, thereby unconstitutionally chilling their research and advocacy relating to the same and to women's health and reproductive rights." (Pl. Supp. Br. at 1.) As this court has previously held, associating with Planned Parenthood or other providers of and advocates for women's reproductive health services and organizations which participate in and advocate for lawful programs to allow abortion patients to donate fetal tissue for scientific research are activities that the First Amendment protects. (*See* PI Order at 12-13.) Nothing in the Ninth Circuit's remand order undermines this conclusion. (*See generally* USCA Order.) And nothing in Mr. Daleiden's flawed analysis of *Herbert* persuades the court otherwise.

1    concludes that the Doe Plaintiffs involved in this type of activity have asserted valid First

2    Amendment constitutional interests.

3            b.  *Groups 1-3 – Fetal Tissue Research*

4            Doe Plaintiffs in all three groups are engaged in activities that are critical to the

5    conduct of fetal tissue research.  The enterprise of university research constitutes First

6    Amendment protected expressive conduct.  *Regents of Univ. of Cal. v. Bakke*, 438 U.S.

7    265, 312 (1978) ("Academic freedom, though not a specifically enumerated

8    constitutional right, long has been viewed as a special concern of the First

9    Amendment."); *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) ("We think

10   it clear that whatever constitutional protection is afforded by the First Amendment

11   extends as readily to the scholar in the laboratory as to the teacher in the classroom.")

12   Similar to Doe Plaintiffs here, the plaintiff *Herbert* asserted that its "association with

13   other Planned Parenthood providers who participate in lawful programs that allow

14   abortion patients to donate fetal tissue for scientific research . . . is protected by the First

15   Amendment."  828 F.3d at 1258.  The Tenth Circuit "ha[d] little trouble in concluding"

16   that the plaintiff's assertion of First Amendment rights was "valid."  *Id*. at 1259.  This

17   court has little trouble in so concluding as well.[15]

18   _____

19   [15] Mr. Daleiden's reliance on *Progressive Animal Welfare Soc. v. Univ. of Wash.*, 884
     P.2d 592, 604 (Wash. 1994) ("*PAWS*"), for the notion that Doe Plaintiffs may not assert a First
20   Amendment interest in university research is misplaced.  (*See* Def. Supp. Br. at 10-11.)  In
     *PAWS*, the Washington Supreme Court merely found no "constitutionally compelling reason"
21   based on a "putative constitutional privilege of academic freedom" to create "a general
     exemption from the [PRA] for public universities and for academics."  884 P.2d at 604.  Doe
     Plaintiffs seek no such "general exemption" here.  In addition, Mr. Daleiden's reliance on
22   *Southwest Center for Biological Diversity v. USDA*, 170 F. Supp. 2d 931 (D. Ariz. 2000), *aff'd*,

The court discusses each group's participation in this First Amendment protected activity because the participation of each group is essential to the conduct of the fetal tissue research at issue. Doe Plaintiffs in Group 1, who procure and transmit fetal tissue to the Lab, conduct work that is not only relevant to fetal tissue research, but fundamentally necessary for that research to occur at all. For example, John Doe 1 is an employee of Seattle Children's Hospital, where pathologists perform autopsies and occasionally "parents desire to donate [fetal] tissue for research purposes." (Doe 1 Decl. ¶ 7.) John Doe 1 explains that when a parent consents to fetal tissue research, "laboratory staff collects tissue in accordance with the parents' written consent." (*Id.*) "Handling of these specimens is a complex process that involves many professionals and administrative and technical staff, including the [Seattle Children's Hospital] Research

---

314 F.3d 1060 (9th Cir. 2002), is also misplaced. (*See* Def. Supp. Br. at 10 n.8.) Although the *Southwest Center* court held that underlying data from a government-commissioned study should be disclosed under the Freedom of Information Act, the court also noted that defendants had not made any showing that "disclosure of the data would be burdensome" and also noted that if privacy interests were at stake, the result might have been different. *Id.* at 943. Further, the *Southwest* court acknowledged that *Dow Chemical* stands for the "unremarkable proposition that, in specific situations, research material may be entitled to some protection" and, in recognizing that protection, the *Dow Chemical* court "balanced the burdens and benefits of compliance with the subpoenas and found that, on the specific facts of the case, the burden was unreasonable." 170 F. Supp. 2d at 942. Finally, Mr. Daleiden also relies on *Humane Society of the United States v. Superior Court of Yolo County*, 155 Cal. Rptr. 3d 93, 118-19 (Cal. Ct. App. 2013). (Def. Supp. Br. at 10 n.8.) Yet in *Humane Society*, the court held that prepublication communications between researchers were protected from disclosure under California's public records act because of "the chilling effect [that] disclosing prepublication research communications could have on academic research." Indeed, the *Humane Society* court aptly noted that "[j]ust as a journalist, stripped of sources, would write fewer, less incisive articles, an academician, stripped of sources, would be able to provide fewer, less cogent analyses." 155 Cal Rptr. at 118 (quoting *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998)). "Such similarities of concern and function militate in favor of a similar level of protection for journalists and academic researchers." *Cusumano*, 162 F.3d at 714.

Laboratory Services core." (*Id.* ¶ 9.) Other staff members similarly play important roles in ultimately making fetal tissue research possible.[16] Thus, the court finds and concludes that Doe Plaintiffs in Group 1, which consists of advocates, practitioners, and staff, are engaged in First Amendment activity when they participate in the foregoing described activities—the first fundamental steps necessary to conduct fetal tissue research—and when they associate with organizations that support this research.

Doe Plaintiffs in Group 2, who staff the Lab, are engaged either directly or indirectly in the fetal tissue research made possible through the Lab. (*See id.* ¶¶ 1, 14.) The Lab is both a laboratory and repository to collect, identify, process, and distribute fetal tissue for purposes of research strictly to non-profit, academic facilities across the country. (Doe 2 Decl. ¶ 5.) The research projects that use fetal tissue are wide-ranging, including past and on-going research into inherited, genetic disease, birth defects, neuroscience, brain infectious diseases, AIDS, stem cell biology, renal disease, autoimmune disease, eye disease and blindness, cardiac disease (in adults and children) pharmacology, diabetes, muscle development and muscular dystrophy, genomics,

---

[16] (*See, e.g.*, Doe 3 Decl. ¶ 7 ("Staff members [at Planned Parenthood of Greater Washington and North Idaho] have a range of duties relating to this tissue donation program. For example, their functions range from administrative functions, such as contracting, program administration, and accreditation, and clinical functions, such a surgical services coordination and quality compliance."); Doe 4 Decl. ¶¶ 5-6 (explaining her role as communications strategist and advocate for all Planned Parenthood affiliates, which would include those donating fetal tissue to the Lab, and promoting and disseminating scholarly research to research partners); Doe 5 Decl. ¶ 4 ("In my role as a genetic counselor, I have had communications with the Lab to coordinate the collection or transport of fetal tissue to the Lab for processing."); Doe 7 Decl. ¶¶ 4-5 ("I am a physician and provider of medical services, including abortion services. . . . As an abortion provider, if a patient consents to donation of fetal tissue, I coordinate with the Lab regarding fetal tissue for research.").

epigenetics, and development biology.  (*Id.* ¶ 11.)  The court finds and concludes that Doe Plaintiffs in Group 2 are engaged in First Amendment protected activity through their association with the Lab and its support of fetal tissue scientific and medical research.

Finally, Doe Plaintiffs in Group 3 are specifically engaged in medical research using fetal tissue and coordinate with the Lab to do this research.  (*See* Doe 7 Decl. ¶¶ 4-5 ("I am a physician and provider of medical services, including abortion services. My work involves both clinical work with patients as well as research and teaching as an Associate Professor at [UW].  In my role as an academic involved in fetal tissue research, I also coordinate with the Lab regarding fetal tissue for research."); Doe 8 Decl. ¶ 4 ("I am a professor and research scientist, with a focus on pediatrics and genetics.  My research involves congenital birth defects.  Some of my work involves the use of fetal tissue for research purposes.  Through my work, I collaborate with the [Lab] regarding fetal tissue samples.").)  The court finds and concludes that this group of Doe Plaintiffs is engaged in First Amendment protected activity by virtue of their scientific research using fetal tissue.

### c. *Staff Members in Groups 1-3*

Doe Plaintiffs assert, and the court finds and concludes, that staff members of those organizations engaged in fetal tissue research and advocacy and the provision of and advocacy for women's reproductive medical services are subject to the same First Amendment protection of their personally identifying information.  Staff members are inevitably associated with the work of the organization with which they are affiliated.

(*See* Pl. Supp. Br. at 8 (citing Amicus Brief of S. Poverty Law Ctr. & Feminist Majority Found. in Support of Does, *Does v. Daleiden*, No. 16-36038, 2017 WL 1045284, at *10 (9th Cir. Aug. 14, 2017) ("SPLC Amicus Brief") (referencing murders in Florida, Massachusetts, Alabama, and Colorado of individuals including clinic volunteers, receptionists, a security officer, and patient companions). Thus, even if they are not directly engaged in advocating for or conducting fetal tissue research or advocating for or providing abortion services, the staff of organizations that do these activities directly facilitate the activities, are associated with the same activities, and are also similarly at risk of harm as a result.

Indeed, in *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87 (1982), the Supreme Court found that First Amendment protection for association with the Socialist Worker's Party extended not only to campaign contributors, but to recipients of campaign expenditures who "enter[] into . . . transaction[s] . . . purely for commercial reasons," and "lack any ideological commitment to the [cause at issue]," as such "individual[s] may well be deterred from providing services by even a small risk of harassment," *id.* at 98, and that "[s]hould their involvement be publicized, these persons would be as vulnerable to threats, harassment, and reprisals as are contributors whose connection with the party is solely financial," *id.* at 97. Further, the Court reasoned that just like those sharing an ideological commitment to the organization, these individuals "may be deterred by the public enmity attending publicity" and "[c]ompelled disclosure of the names of such [organizational associates] could therefore cripple [the organization's] ability to operate effectively. *Id.* Similarly, in *Perry v. Schwarzenegger*,

591 F.3d 1147 (9th Cir. 2010), the Ninth Circuit extended First Amendment protection in the discovery context to prevent disclosure of the identity of members of a group supporting the amendment of the California Constitution to provide for marriage only between a man and a woman, as well as the content of internal campaign communications among members, employees, and agents of the association. *See id.* at 162-63.

The same analysis that the Supreme Court applied in *Brown* and the Ninth Circuit applied in *Perry* applies to Doe Plaintiffs who are employed as staff. These Doe Plaintiffs support individuals and organizations engaged in fetal tissue research and advocacy and organizations engaged in the provision of and advocacy for women's reproductive medical services. As such, they are entitled to the same First Amendment protection for their association with the organizations. *See also Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) ("The First Amendment's protection 'extends not only to the organization itself, but also to its staff, members, contributors, and others who affiliate with it.'") (quoting *Int'l Union v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978)); *City of Greenville v. Syngenta Crop Prot., Inc.*, No. 11-MC-10, 2011 WL 5118601, at *6 (C.D. Ill. Oct. 27, 2011) ("Sometimes disclosing internal communications, including communications with members, may inhibit members and association staff from participating in advocacy activities and from exchanging and [sic] ideas freely and openly."). Based on the foregoing authorities, the court finds and concludes that Doe Plaintiffs employed as staff at these organizations are no less entitled to First Amendment protection of their

personally identifying information based on their associational rights merely because their work in support of these organizations' missions is administrative in nature.[17]

Mr. Daleiden argues that Doe Plaintiffs offer no limiting principle for application of the First Amendment rights they assert and that application of the First Amendment to Doe Plaintiffs would result in "every supplier of goods or services to the [UW] . . . be[coming] eligible for a First Amendment exemption from disclosure under the PRA." (Def. Supp. Resp. at 2-3.) Mr. Daleiden's stated concerns are overblown. Doe Plaintiffs fall within the ambit of First Amendment associational rights because they work with groups like Planned Parenthood or other organizations that support fetal tissue research and their absence would negatively impact the operations of these groups. Even individuals who engage with an organization for "'merely' commercial transactions"— such as employees, staff, business associates, or donors—receive First Amendment associational protections because, just like those who share an ideological commitment to the organization, they "may be deterred by the public enmity attending publicity" and

//

//

---

[17] Mr. Daleiden argues that the "mere" sending of "invoices and administrative emails" is insufficient to qualify Doe Plaintiffs who are staff members of the organizations at issue for constitutional protections. (Def. Supp. Br. at 2-3.) As indicated by the case law cited above, this is not the law. *See supra* § III.B.1.c. Further, the court rejects Mr. Daleiden's assertion that First Amendment associational protection only applies in the context of a "discrete advocacy organization." (*See* Def. Supp. Br. at 6, n.3.) As Doe Plaintiffs point out, if a member of one group, for example the Lab, interacts with another group, such as Planned Parenthood, that association is protected so long as its future interactions with Planned Parenthood or the Lab, and in turn Planned Parenthood's advocacy or the Lab's research, could be chilled if the association were disclosed. (*See* Pl. Supp. Br. at 3.) Other courts have so concluded, *see, e.g.*, *City of Greenville*, 2011 WL 5118601, at *6 (recognizing First Amendment associational rights for communications between associations), and this court does as well.

"[c]ompelled disclosure of the names of such [organizational associates] could therefore cripple [the organization's] ability to operate effectively." *Brown*, 459 U.S. at 98.[18]

In sum, the court finds and concludes that Doe Plaintiffs in all three groups, including Doe Plaintiffs who serve as staff for these groups, engage in First Amendment protected activities by virtue of their association with organizations that engage in and advocate for fetal tissue research and organizations that engage in and advocate for reproductive health services for women, such as abortion.

_____

[18] Further, although Mr. Daleiden argues that the scope of this protection is impermissibly broad, he neglects to acknowledge that the scope of individuals actually seeking protection under this principle is inherently limited. Specifically, Mr. Daleiden has only requested those records that relate to "the purchase, transfer, or procurement of human fetal tissues" by the Lab. (*See* Power Decl. Ex. C.) The responsive records subject to the preliminary injunction would only identify those individuals who are directly involved in the procurement of the fetal tissues or the research that is conducted using that tissue. Thus, the individuals seeking protection and the responsive documents subject to the preliminary injunction are directly and inextricably linked to the advocacy and research missions of the organizations Doe Plaintiffs serve. (*See, e.g.*, Doe 1 Decl. ¶ 11 (discussing Seattle Children's Labs working with patients who "had doubly consented to both an autopsy and fetal tissue donation to [the Lab]"); Doe 2 Decl. ¶ 5 ("The [UW] School of Medicine manages a Birth Defects Research Laboratory . . . and repository to collect, identify, process and distribute fetal tissue for research purposes strictly to non-profit, academic facilities around the country."); Doe 3 Decl. ¶ 6 ("[Planned Parenthood of Greater Washington and North Idaho] partners with [the Lab] at [UW] School of Medicine to collect fetal tissue for research purposes."); Doe 4 Decl. ¶¶ 6-7 ("I also promoted and disseminated Planned Parenthood's scholarly research to media, practitioners, and research partners, and arranged expert interviews . . . . To the best of my knowledge, there exists only one email which was forwarded to [the Lab]."); Doe 5 Decl. ¶ 4 ("As a part of my work, I have had contact with [the Lab] . . . to coordinate the donation of tissue by our clients."); Doe 6 Decl. ¶ 4 ("In my role as a genetic counselor, I have had communications with the Lab to coordinate the collection or transport of fetal tissue to the Lab for processing."); Doe 7 Decl. ¶ 5 ("As an abortion provider, if a patient consents to donation of fetal tissue, I coordinate with the Lab regarding collection. In my role as an academic involved in fetal tissue research, I also coordinate with the Lab regarding fetal tissue for research."); Doe 8 Decl. ¶ 4 ("Some of my work involves the use of fetal tissue for research purposes.").)

*d. Threats, Harassment, or Reprisals*

In order to demonstrate that they are likely to succeed on their First Amendment claims, however, Doe Plaintiffs must do more than simply demonstrate that they engage in First Amendment protected activity. The Supreme Court has stated that those resisting government-required disclosure "can prevail under the First Amendment if they can show 'a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Reed*, 561 U.S. at 200 (quoting *Buckley*, 424 U.S. at 74) (alteration in original). The Supreme Court has also detailed the type of evidence upon which Doe Plaintiffs may rely:

> The proof may include . . . specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient.

*Buckley*, 424 U.S. at 74. In its remand order, the Ninth Circuit stated that it "agreed with the district court that there may be a basis for redaction where disclosure would likely result in threats, harassment, and violence." (USCA Order at 3.) Nothing in the Ninth Circuit's order or the parties' briefing on remand leads the court to alter its prior conclusion that "Plaintiffs are likely to succeed on the merits of their claim that disclosure of their personally identifying information would render them and those similarly situated 'uniquely vulnerable to harassment, shaming, stalking, or worse,'" and thereby violate their constitutional rights. (PI Order at 18-19 (quoting *Roe v. Anderson*, No. 3:14-CV-05810 RBL, 2015 WL 4724739, at *1 (W.D. Wash. Aug. 10, 2015)).)

As described in the court's prior order, Doe Plaintiffs have submitted multiple declarations detailing past and present harassment due to Plaintiffs' associational ties with the various organizations at issue, as well as threats and harassment directed against the organizations themselves. (*See* PI Order at 14-15.) For clarity, the court recounts that evidence here. First, Ellen Gertzog, National Director for Affiliate Security at Planned Parenthood Federation of America ("PPFA"), detailed the history of violence against abortion providers and abortion-providing facilities and the escalating nature of the threats and acts of violence since 2015. (*See generally* Gertzog Decl. (Dkt. # 3).) She attests that since 1977 there have been 11 murders, 26 attempted murders, 42 bombings, 185 arsons, and thousands of incidents of criminal activities directed at abortion providers. (*Id.* ¶ 3.) In addition, the number of reported incidents of vandalism of Planned Parenthood health centers doubled from nine in 2014 to 18 in 2015. (*Id.* ¶ 13.) Ms. Gertzog also testifies that Planned Parenthood employees have been harassed at their homes, in their workplaces, over the phone, and on social media—"all due to the nature of their employment and their association with abortion." (*Id.* ¶ 5; *see also id.* ¶ 7.) She concludes that, "[b]ased on [her] expertise with security risks, . . . if personally identifying information for people associated with fetal tissue donation and research and the Birth Defects [Research Laboratory] at [UW] is publicly released, those persons will be at particular risk due to the nature of their work and the publicity surrounding the fetal tissue donation." (*Id.* ¶ 14.)

Likewise, Connie Cantrell, the Executive Director of Cedar River, testifies that as a result of its employees' reproductive freedom advocacy, Cedar River Clinics "have

been firebombed, vandalized, blocked, and terrorized." (Cantrell Decl. (Dkt. # 4) ¶ 2.) Of particular relevance, the Cedar River Clinic in Renton, Washington, received a bomb threat. (*Id.* ¶ 4.) The Clinics' employees and their children "have been harassed, stalked, received death threats, and [been] persecuted at the clinics they work at, and even sometimes at their homes." (*Id.* ¶ 2.) Cedar River coordinates with the Lab to collect tissue donated by those people whom Cedar River serves. (*Id.* ¶ 5.) Those donors provide the tissue pursuant to a Certificate of Confidentiality from the National Institute of Health and Child Human Development, which prevents the disclosure of identifying information. (*Id.*) However, employees of Cedar River must interact with the Lab on behalf of their patients in order to effectuate the transfer of information that is otherwise protected from disclosure. (*Id.*) Ms. Cantrell attests that ordering the disclosure of the Cedar River's employees' private information will subject those employees to increased threats and greater risk of violence from those who oppose fetal tissue research and abortion "simply because [the employees] interact with a public agency." (*Id.* ¶ 7.)

Indeed, there has been a well-documented, significant increase in the harassment of individuals involved in fetal tissue research and the procurement of fetal tissue for purposes of this research since Mr. Daleiden released videos misleadingly suggesting that abortion providers and others illegally "profit" from the sale of fetal tissue.[19] (Gertzog

---

[19] In *National Abortion Federation v. Center for Medical Progress*, No. 15-CV-03522-WHO, 2016 WL 454082 (N.D. Cal. Feb. 5, 2016), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623 (9th Cir. 2017), Judge William H. Orrick granted a preliminary injunction prohibiting Mr. Daleiden and other defendants from publishing the videos referenced above, which Mr. Daleiden and other defendants had filmed at National Abortion Federation ("NAF") annual meetings. *Id.* at *26. In

ORDER - 27

Decl. ¶¶ 1, 3, 5-13 (detailing the history of violence against abortion providers and the escalating nature of threats and acts of violence since 2015; stating that "[i]n the immediate aftermath of [Mr. Daleiden's] video release, Planned Parenthood employees were subjected to increased threats and harassment," including the offer of a $10,000.00 bounty to murder a Planned Parenthood physician; and detailing the arson at the Planned Parenthood health center in Pullman, Washington, in September 2015); *id.* Ex. 4 (attaching National Abortion Federation 2015 Violence and Disruption Statistics); Cantrell Decl. ¶ 4 (discussing the increase in violence against abortion providers following "the July 2015 release of a series of videos; and stating that "[o]ne of the unedited videos was a released despite a court order injunction, and included a discussion between myself and . . . [Mr.] Daleiden, . . . [and] [a]s a result of my appearance in those videos and my connection with Cedar River Clinics, we experienced a huge increase in protestors . . . who were more hostile to patients and staff . . . [and] [i]n addition, our Renton clinic received a bomb threat which disrupted services.").

Doe Plaintiffs, who work with Planned Parenthood, Seattle Children's Hospital, Cedar River Clinics, Evergreen Hospital Medical Center, and the University of Washington, also submit declarations detailing their own reasonable fears of harm if their

---

the course of his order granting a preliminary injunction, Judge Orrick stated that he "reviewed the [video and audio] recordings . . . and [found] no evidence of criminal activity." *Id.* at *1. Judge Orrick also noted that "the misleading nature of the . . . videos . . .—reflective of the misleading nature of defendants' repeated assertions that the recordings at issue show significant evidence of criminal wrongdoing—have had tragic consequences, including [a violent attack by a gunman on an abortion clinic in Colorado]." *Id.* at *23 n.42; *see also id.* at *22 ("[T]he release of videos . . . has directly led to a significant increase in harassment, threats, and violence directed not only at the 'targets' of . . .[the] videos but also at NAF and its members more generally.").

personally identifying information is released to Mr. Daleiden.  (*See generally* Does 1-8

Decls.)  All of the Doe Plaintiffs are aware of threats or acts of violence against

individuals or institutions that are involved in providing clinical abortions or conducting

fetal tissue research.  (*See* Doe 1 Decl. ¶ 14; Doe 2 Decl. ¶ 14; Doe 3 Decl. ¶¶ 12-14; Doe

4 Decl. ¶ 11; Doe 5 Decl. ¶ 6; Doe 6 Decl. ¶ 7; Doe 7 Decl. ¶ 7; Doe 8 Decl. ¶ 6.)  All of

the Doe Plaintiffs also fear that they, their families, and their colleagues will be subjected

to such threats or acts of violence due to their involvement with the fetal tissue research

conducted by the Lab if their personally identifying information is released.  (*See* Doe 1

Decl. ¶¶ 15-16; Doe 2 Decl. ¶ 14; Doe 3 Decl. ¶¶ 14-16; Doe 4 Decl. ¶¶ 8-10; 12-13; Doe

5 Decl. ¶ 7; Doe 6 Decl. ¶¶ 6-7; Doe 7 Decl. ¶¶ 6-7; Doe 8 Decl. ¶¶ 5-6.)  In fact, based

on those reasonable fears, Doe Plaintiffs have taken measures to keep private the

individually identifying information that is associated with their engagement in fetal

tissue donation, advocacy, and/or research.  (*See* Doe 1 Decl. ¶ 13; Doe 3 Decl. ¶ 8; Doe

5 Decl. ¶ 5.)

       The court agrees with Doe Plaintiffs that protection against the disclosure of

personally identifying information is all the more critical here because Mr. Daleiden

himself has willfully disregarded a prior federal court order to refrain from publishing

and disclosing to third parties videos taken at an NAF annual meeting.  (*See* Pl. Supp. Br.

at 14 (citing *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO,

2017 WL 3021024 (N.D. Cal. July 17, 2017) ("*NAF I*") (order of civil contempt against

Mr. Daleiden and others for willfully violating a preliminary injunction by publishing and

disclosing videos to third parties) and *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,

No. 15-CV-03522-WHO, 2017 WL 3782117 (N.D. Cal. Aug. 31, 2017) ("*NAF II*")

(order finding Mr. Daleiden and others jointly and severally liable to NAF for civil

contempt sanctions in the amount of $195,359.04)).)  As a result of Mr. Daleiden's

actions, "NAF and its members whose identities were disclosed in the . . . video [saw] a

sharp increase in 'negative and disturbing' threats."  *NAF I*, 2017 WL 3021024, at *5.[20]

Mr. Daleiden protests that his citation for contempt for disclosing nonpublic

information in defiance of a court order is "unrelated to any concern that [Doe] Plaintiffs

have articulated in this case that involves only public information."  (Def. Supp. Br. at 13

n.11.)  To the contrary, public information concerning Mr. Daleiden's conduct in

releasing misleading information related to fetal tissue donation and research in violation

of a court order and the correlated increase in threats experienced by those he targeted is

directly related to Doe Plaintiffs' demonstration of a "reasonable probability that the

compelled disclosure [of personal information] will subject them to threats,

harassment, or reprisals.'"  *See Reed*, 561 U.S. at 200 (quoting *Buckley*, 424 U.S. at 74)

(alteration in original).  Mr. Daleiden's prior conduct supports Doe Plaintiffs' reasonable

//

//

---

[20] (*See also* Doe 7 Decl. ¶¶ 6-7 ("I am concerned about release of my personal identifying information in connection with the Lab.  If my personal identifying information . . . is disclosed . . . I have real concerns for my safety and privacy.  If any one or more of those personal identifying pieces of information are disclosed, my identity can be confirmed.  There has been a significant increase in the amount of violence against both abortion providers and threats against anyone associated with fetal tissue research.  The gunman who killed three people at Planned Parenthood in Colorado in 2015 specifically referenced fetal tissue as a cause of his attack.  David Daleiden's spurious videos trying to malign abortion providers and clinics have led to death threats and safety concerns for providers identified in those videos.  I am concerned that I and anyone specifically identified could be at risk of similar threats and violence.").

fear that he will use their personally identifying information in a manner that will subject them to threats, harassment, and reprisals.  Thus, Mr. Daleiden's recent release of nonpublic information in defiance of a court order is relevant to the court's consideration of the risks attendant upon Doe Plaintiffs here.

As it did previously, the court again concludes that Doe Plaintiffs are likely to succeed on the merits of their claim that disclosure of their personally identifying information would render them and those similarly situated uniquely vulnerable to harassment, shaming, stalking, or worse, and in this context, would violate their constitutional First Amendment rights of expression and association.  Thus, the court also concludes that Plaintiffs are likely to succeed on the merits of their claim that their personally identifying information is exempt from disclosure under the PRA because such disclosure would violate their First Amendment rights.

### e.  The Eight Named Individuals

In his PRA request, Mr. Daleiden sought records related to the Lab generally and also to eight specifically identified individuals.  (Power Decl. ¶ 4, Ex. C at 1-2.)  Mr. Daleiden argues that these eight individuals are known to be associated with fetal tissue advocacy, procurement, transfer, or research, and thus their names should not be redacted from the documents.  (*See* Daleiden Decl. ¶ 26.)  In its preliminary injunction, the court relied upon *Bainbridge Island Police Guild v. City of Puyallup*, 259 P.3d 190 (Wash. 2011), to conclude that "Mr. Daleiden's ability to find certain publicly available information about eight individuals that he believes will be named in the records at issue is irrelevant to the right of those individuals to claim a valid exemption under the PRA

based on their constitutional rights." (PI Order at 25.)  The Ninth Circuit held that this court "improperly applied *Bainbridge Island Police Guild* . . . to conclude that the existence of publicly available information about certain individuals was 'irrelevant' to their 'right to claim a valid exemption' to the [PRA], and to avoid engaging in 'fact-specific inquir[ies]' as to different individuals' constitutional and statutory rights." (USCA Order at 4 n.2 (first alteration added; second alteration in original).)  The Ninth Circuit counseled that "affirmative and public association with matters discussed in a public record could be one of several considerations relevant to determining whether disclosure would violate an individual's rights, and fact-specific inquiry is precisely what is required to make this determination." (*Id.* (citing *Reed*, 561 U.S. at 197-202).)

In *Reed*, the Supreme Court rejected a broad argument that signatories to referendum petitions should always be protected from disclosure under the PRA.  Instead, the Supreme Court found that the plaintiffs' alleged harms were specific to the controversial referendum petition at issue, which concerned marriage equality, rather than a risk of harm common to all referendum petitions.  Accordingly, the Supreme Court remanded for the plaintiffs to "press the narrower challenge" related to the specific referendum at issue and directed that, to succeed, plaintiffs must demonstrate a "reasonable probability that the compelled disclosure" of the names of individuals who signed the petition would "subject them to threats, harassment, or reprisals." *Reed*, 561 U.S. at 201 (quoting *Buckley*, 424 U.S. at 74).  Justice Sotomayor concurred, noting that a factor undercutting the plaintiffs' claim was that "the process of legislating by referendum is inherently public . . . [and] the State's decision to make accessible what

1  [the signers] voluntarily placed in the public sphere should not deter them from engaging

2  in the expressive act of petition signing."  *Id.* at 214 (Sotomayor, J., concurring).

3       The eight named individuals at issue here did not disclose their names in the

4  context of an "inherently public" act like signing a referendum.  Although all Doe

5  Plaintiffs work or are otherwise associated with the organizations at issue (*see generally*

6  Doe 1-8 Decls.), the names of the eight identified individuals apparently become

7  associated with fetal tissue research as a consequence of their positions at the Lab, Cedar

8  River Clinics, Planned Parenthood of Greater Washington and North Idaho, and Planned

9  Parenthood Federation of America.  (*See* Daleiden Decl. ¶ 26.)  Indeed, Mr. Daleiden was

10  able to identify these individuals primarily through research on the internet.  (*See id.*

11  ¶¶ 27-34.)  Thus, the primary difference between the eight-named individuals and the

12  remaining Doe Plaintiffs appears to be the nature of their roles in the organizations for

13  which they work. [21]

14       The court agrees with Doe Plaintiffs that *Bainbridge* underscores the distinction

15  identified in *Reed* involving "inherently public" acts and, consistent with the Ninth

16  Circuit's counsel in this case, teaches that in some circumstances a reasonable probability

17  of harassment can be shown even where the plaintiff is already in the public's eye or

18  //

---

19
20  [21] The court notes that in one instance one of the named individuals gave an interview to a local newspaper and publicly identified himself as the Executive Director of the Lab. (Daleiden Decl. Ex. G.)  The article, however, is from 2001—more than 16 years ago (*see id.* at

21  1), and according to Mr. Daleiden, this individual is no longer the Lab's Executive Director (*id.* ¶ 26).  Further, the article describes various threats that the former Executive Director received due to the fetal tissue research conducted at the Lab and violence ("a brief struggle") that

22  occurred outside his home between protestors and a neighbor.  (*See id.* Ex. G.)

otherwise publicly identified. (*See* Pl. Supp. Br. at 10.) In *Bainbridge*, the court required

redaction of the name of a police officer prior to producing documents under the PRA

related to an investigation of the officer for sexual misconduct. 259 P.3d at 199-200.

Even though an unredacted version of one report to the investigation had already been

publicly produced and then covered in the local news, the Washington Supreme Court

still refused to allow disclosure of the same report and other documents without redacting

the officer's name. *Id.* The *Bainbridge* court explained that "just because some members

of the public may already know the identity of the person in the report, it does not mean

that an agency does not violate the person's right to privacy by *confirming* that

knowledge through its production." *Id*. at 197 (emphasis added). One could also argue

that the prominent roles of the eight named individuals in organizations that conduct

advocacy places them in the public's eye and cuts against redaction, but the public nature

of the police officer's role in *Bainbridge* did not vitiate his right to have his name

redacted from a PRA production under the facts of that case. *See id.* Thus, while the

Ninth Circuit noted that public disclosure is a factor in any privacy analysis (*see* USCA

Order at 4 n.2), this court should order the redaction of personally identifying information

from disclosure where, based on a fact-specific inquiry, the court concludes that the

information would confirm public knowledge about an individual, and that such

confirmation would lead to a probability of future harassment or harm. Taken together,

*Reed* and *Bainbridge* stand for the proposition that a fact-specific inquiring involves

determining whether there is a reasonable probability of harassment to Doe Plaintiffs,

1  including the eight-named individuals, through either (1) disclosure of new information,

2  or (2) confirmation of previously known information.

3        Mr. Daleiden argues that if a fact is already known, simply confirming it will not

4  increase the probability of harm from disclosure in every case.  However, in this case, the

5  evidence before the court indicates that an increase in harassment—even for those

6  already known to be affiliated with abortion rights or fetal tissue research—is likely.

7  (*See, e.g.*, Cantrell Decl. ¶ 4 (stating that following Ms. Cantrell's appearance in a video

8  released by Mr. Daleiden and highlighting her connection to the Cedar River Clinic as its

9  Executive Director, the Clinic experienced a significant increase in hostile protestors and

10  a bomb threat); *see also* Gertzog Decl. ¶¶ 8-9 (stating that following the release of the

11  videos showing Planned Parenthood employees discussing fetal tissue donation, there

12  was a sharp increase in threats, harassment, vandalism, and violence against Planned

13  Parenthood affiliates, staff members, and patients).  Thus, under the specific facts, the

14  court discerns no reason to exclude the names or other personally identifying information

15  of the eight individuals named by Mr. Daleiden in his PRA request from the scope of the

16  preliminary injunction.

17        2.  Privacy

18        Not only is Doe Plaintiffs' personally identifying information subject to protection

19  because Doe Plaintiffs are likely to prevail on their claim that disclosure will violate their

20  First Amendment rights, the redaction of Doe Plaintiffs' personally identifying

21  information is also required by article 1, section 7 of the Washington State Constitution.

22  "[T]he Washington Constitution may exempt certain records from production" under the

PRA because the Constitution "supersedes contrary statutory laws." *White v. Clark Cty.*,

631, 354 P.3d 38, 41-42 (Wash. Ct. App. 2015) (citing *Freedom Found*, 310 P.3d at

1258). Article 1, section 7 provides that "[n]o person shall be disturbed in his private

affairs, or his home invaded, without authority of law." Wash. Const., art. 1 §7.

Interference with this broad right to privacy is permissible only insofar as is reasonably

necessary to further substantial governmental interests that justify the intrusion. *State v.*

*Arreola*, 290 P.3d 983, 988 (Wash. 2012). The Washington Constitution provides

broader privacy protection than that afforded under the federal Constitution, as article 1,

section 7 "'clearly recognizes an individual's right to privacy with no express limitations'

and places greater emphasis on privacy." *State v. Ladson*, 979 P.2d 833, 837 (Wash.

1999) (quoting *State v. Young*, 867 P.2d 593, 596 (Wash. 1994)).

Applying article 1, section 7 to the PRA requires a two-part analysis. *Wash. Pub.*

*Employees Ass'n*, 404 P.3d at 115. The first step requires determining whether the state

unreasonably intruded into a person's private affairs. *Id.* If a person's private affairs are

not disturbed, the court's analysis ends, and there is no article 1, section 7 violation. *Id.*

If, however, the state has disturbed a person's private afffairs, the second step is to

determine whether authority of law justifies the intrusion. *Id.*

In *Washington Public Employees Association*, unions representing state employees

filed motions for a TRO and preliminary injunction seeking to prevent various state

agencies from releasing the employees' full names associated with their corresponding

birthdates in response to a PRA request. *Id.* at 114. The unions argued that by publicly

disclosing the requested information, someone "could discover personal financial

information, commit identity theft, or find confidential information such as the identified state employees' personal addresses and personal telephone numbers." *Id.* at 116. They argued that the government disclosure "exposes state employees to the risk of their private affairs and intimate details being exposed to the public." *Id.*

In considering whether such a release of information would disturb the plaintiffs' private affairs, the Washington Court of Appeals stated that "[a] citizen of this state would reasonably expect that personal information, such as the public disclosure of his or her full name associated with his or her corresponding birthdate, that would potentially subject them to identity theft and other harms, would remain private." *Id.* The court noted that people publicly expose this information "to some extent," but recognized that "these disclosures are typically at the person's discretion and control." *Id.* State disclosure of this information, on the other hand, "would not be voluntary or within the employee's control," and once released, the plaintiffs "would potentially be subject to an *ongoing* risk of identity theft and other harms from the disclosure of this personal information." *Id.* (italics in original). Accordingly, the Washington Court of Appeals held that under article 1, section 7 of the Washington Constitution, each plaintiff was "entitled to an expectation of privacy in his or her full name associated with his or her corresponding birthdate." *Id.*

The court finds this case analogous to the facts presently at issue. Here, the harm Doe Plaintiffs fear is not identity theft but an increase in threats, harassment, and reprisals as a consequence of their association with women's reproductive services or fetal tissue

research.[22]   Based on the evidence in the record concerning the increase in threats and

violence directed at individuals associated with fetal tissue research or women's

reproductive rights after their association with such activities is publicly revealed or

confirmed (*see, e.g.*, Cantrell Decl. ¶ 4; Gertzog Decl. ¶¶ 8-9), the harm Doe Plaintiffs

fear if their personally identifying information is released is just as significant—if not

considerably more severe—than the harm of identity theft that the plaintiffs feared in

*Washington Public Employees Association*.

Further, the type of information that Doe Plaintiffs seek to protect is also

analogous.  The plaintiffs in *Washington Public Employees Association* sought to protect

their names associated with their birthdates because release of this combined information

would leave them vulnerable to the harm of identity theft.[23]  404 P.3d at 114.  Here, Doe

Plaintiffs seek to protect their personally identifying information that is associated with

fetal tissue research because the release of their name tied to this research would leave

---

[22] Like the plaintiffs in *Washington Public Employees Association*, there is evidence that at least some Doe Plaintiffs—specifically the eight named individuals—have publicly exposed their names, but there is no indication that they have done so in a manner that associates their name with any of their other personally identifying information.  Further, they have presumably exposed their names in a manner that is at their discretion and within their control.  This type of disclosure did not undermine the plaintiffs' expectation of privacy under article 1, section 7 of the Washington Constitution in *Washington Public Employees Association*, and accordingly, the court finds that it does not undermines the eight named individuals' expectation of privacy with respect to the documents at issue here.

[23] The plaintiffs initially sought protection for their names, birthdates, and work email addresses, but the only information at issue on appeal was the plaintiffs' names and birthdates.  *Wash. Pub. Emps. Ass'n*, 404 P.3d at 114.  The court provides no explanation as to why the release of email addresses was not considered on appeal other than to say that "[a] commissioner of th[e Washington Supreme C]ourt granted the motion for a stay [of the superior court's denial of the plaintiffs' motion for a preliminary injunction] only as to the state employees' full names associated with their corresponding birthdates."  *Id.*

them vulnerable to threats, harassment, and reprisals. The court finds Doe Plaintiffs' circumstances and privacy concerns analogous to the plaintiffs in *Washington Public Employees Association*. Accordingly, the court finds and concludes that Doe Plaintiffs are entitled, under article 1, section 7 of the Washington Constitution to an expectation of privacy in the personally identifying information contained in the documents at issue here. *See Wash. Pub. Emps. Ass'n*, 404 P.3d at 116.

Next, the court considers "whether authority of law justifies the intrusion." *Id.* at 117. In *Washington Public Employees Association*, the Washington Court of Appeals considered whether the PRA "justif[ied], rather than allow[ed], an intrusion into a constitutionally protected interest." *Id.* The court first noted that the PRA has a "comprehensive stated purpose" to keep the people "informed so that they may maintain control over the instruments that they have created." *Id.* (quoting RCW 42.56.030). The court reasoned that public disclosure of the plaintiffs' names and birthdates did "not inform the people of facts about an 'instrument' they have created or provide information that allows the people to maintain control over those instruments." *Id.* Further, the court noted that disclosure of the plaintiffs' names and birthdates "would reveal discrete personal details of state employees not connected to their role as public servants." *Id.* Accordingly, the court concluded that the purpose of the PRA was not served by disclosure of the plaintiffs' personal information. *Id.*

The court sees no principled way to distinguish the court's ruling in *Washington Public Employees Association* from the case presently before it. The information the public needs about the Lab to "maintain control over [that] instrument" is not the

1   personally identify information of Doe Plaintiffs.  All the substantive information about

2   the Lab contained in the documents responsive to Mr. Daleiden's PRA request has been

3   released.  And release of Doe Plaintiffs' personally identifying information would release

4   private information about these individuals and likely to subject them to significant

5   threats or harm.  The purpose of the PRA is "to provide broad access to public records to

6   ensure government accountability," *Benton Cty. v. Zink*, 361 P.3d 801, 806 (Wash. Ct.

7   App. 2015); it was never intended to "facilitate spying, stalking, or to enable a host of

8   other nefarious goals," *Anderson*, 2015 WL 4724739, at *2.  Accordingly, like the court

9   in *Washington Public Employees Association*, this court too finds that, under the

10  particular facts of this case, the PRA does not justify the intrusion into Doe Plaintiffs'

11  constitutionally protected expectation of privacy in their personally identifying

12  information.[24]

13      Thus, in addition to First Amendment expressive and associational rights, the

14  court also finds and concludes that Doe Plaintiffs have a constitutionally protected

15  expectation of privacy in their personally identifying information based on article 1,

16  //

---

17  [24] Mr. Daleiden argues that *Washington Public Employees Association* is wrongly
    decided and the court should not follow it.  (Def. 2d Supp. Br. at 3 (describing the *Washington*
18  *Public Employees Association* opinion as "in error"); *id.* ("[T]he Washington Court of Appeals
    mistakenly held that, 'under article 1, section 7 [of the Washington Constitution], a state
19  employee is entitled to an expectation of privacy in his or her full name associated with his or her
    corresponding birthdate.'"); *id.* at 5 ("This Court should not endorse the [*Washington Public*
20  *Employees Association*] Opinion's erroneous reasoning . . . .").)  "However, 'in the absence of
    convincing evidence that the highest court of the state would decide differently,' a federal court
21  is obligated to follow the decisions of the state's intermediate courts."  *In re Kirkland*, 915 F.2d
    1236, 1239 (9th Cir. 1990) (quoting *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1143
22  (9th Cir. 1981) and *Stoner v. N.Y. Life Ins. Co.*, 311 U.S. 464, 467 (1940)).  The court finds no
    reason to depart from this general rule.

section 7 of the Washington Constitution, and they are likely to succeed on the merits of their claim that this right to privacy under the Washington Constitution requires UW to redact their personally identifying information from the documents Mr. Daleiden requested under the PRA.

**C.     The Remaining *Winter* Factors**

As it did in its previous order granting Doe Plaintiffs' motion for a preliminary injunction, the court once again finds and concludes that Doe Plaintiffs are likely to succeed on their claims that the disclosure of their personally identifying information in response to Defendants' PRA requests will violate their First Amendment expressive and associational rights.  *See supra* § III.B.1.  The denial of First Amendment freedoms "unquestionably constitutes irreparable injury" supporting the issuance of a preliminary injunction.  *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citing *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012), and *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009).  In addition, the court now finds a likely violation of Doe Plaintiffs' Washington constitutional right of privacy, *see supra* § III.B.2., and this also warrants a finding of irreparable injury.  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence." (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981))); *see also Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380,

382 (1st Cir. 1987). Doe Plaintiffs have, therefore, demonstrated that they will suffer

irreparable harm in the absence of a preliminary injunction.

Next, the court considers whether a preliminary injunction will serve the public

interest. The court agrees that the public has an interest in understanding and obtaining

information about the types of research and other work for which UW or the Lab uses

public funds. Indeed, the PRA expressly states that "[t]he people insist on remaining

informed so that they may maintain control over the instruments that they create." RCW

42.56.030. However, redacting Doe Plaintiffs' personally identifying information from

the documents responsive to Mr. Daleiden's PRA requests will do little, if anything, to

undermine this interest. On the other hand, the Ninth Circuit has "consistently

recognized the significant public interest in upholding First Amendment principles."

*Harris*, 772 F.3d at 583 (quoting S*ammartano v. First Judicial Dist. Ct.*, 303 F.3d 959,

974 (9th Cir. 2002)). The court concludes that disclosure of Doe Plaintiffs' personally

identifying information would run contrary to the public interest because it would do

little to further the PRA's purpose of ensuring government accountability, while violating

Doe Plaintiffs' state constitutional privacy rights, exposing them to the threat of violence

or harassment, and their chilling First Amendment associational rights. The court

concludes that the public interest factor weighs in favor of issuing the preliminary

injunction.

As for the balance of equities, the court's analysis follows the same logic as its

analysis of the public interest factor. The court recognizes that the public and Mr.

Daleiden have an interest in the production of documents responsive to his PRA request.

Furthermore, as noted above, the public has an interest in obtaining information concerning research conducted by UW and the Lab. However, as also noted above, obtaining Doe Plaintiffs' personally identifying information would contribute little, if anything, to the public's interest in understanding and being informed about the types of research UW and the Lab conducts. Moreover, Mr. Daleiden has disavowed any interest in obtaining Doe Plaintiffs' personally identifying information. (*See* Def. Supp. Resp. at 1 n.1 ("Defendant has not asked for the inclusion of names . . . or personal contact information."); Def. Resp. at 2 ("[Mr.] Daleiden . . . ha[s] agreed to a redaction of the plaintiffs' personal identifying information.").) Thus, a preliminary injunction that precludes disclosure of Doe Plaintiffs' personally identifying information will cause Defendants little, if any, hardship. On the other hand, Doe Plaintiffs have demonstrated that, absent the preliminary injunction, there is a likelihood that their First Amendment and privacy rights will be impinged. Thus, the court concludes that the balance of the equities tips sharply in Doe Plaintiffs' favor.

The court again concludes (*see* PI Order at 21)—with the benefit of the Ninth Circuit's guidance (*see* USCA Order)—that all of the *Winter* factors favor imposing a preliminary injunction that prohibits the disclosure of Plaintiffs' personally identifying information in response to Defendants' PRA requests. Nothing in the court's analysis supports narrowing the scope of the preliminary injunction, and so the court will reissue

//

//

//

the preliminary injunction consistent with the scope of its prior order.[25]  (*See* PI Order at 25-26.)

## IV.  CONCLUSION

Accordingly, based on the Ninth Circuit's guidance in its remand order, the relevant law, and the facts on record herein, the court REISSUES the same preliminary injunction that it originally imposed on November 16, 2016.  (*See* PI Order.) Accordingly, the court preliminarily enjoins UW from releasing the requested documents at issue herein without first redacting all personally identifying information or information from which a person's identity could be derived with reasonable certainty for all individuals.  Such information includes but is not limited to (a) information that identifies or provides the location of an individual, (b) information that would allow an individual to be identified or located, (c) information that would allow an individual to be contacted, (d) names of individuals, (e) phone numbers, (f) facsimile numbers, (g) email

//

//

//

//

//

//

//

_____

[25] The court again declines to impose a bond.  (*See* PI Order at 21 (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).)

and mailing addresses, (h) social security or tax identification numbers, and (i) job titles.[26]

IT IS SO ORDERED.

Dated this 30th day of November, 2017.


JAMES L. ROBART
United States District Judge

---

[26] During the course of oral argument, counsel for UW indicated that UW had interpreted the court's preliminary injunction to require the redaction of certain entities' names where the name of the entity could provide the location of an individual.  Mr. Daleiden argued that this interpretation of the court's order prevented him from obtaining substantively useful information that was unrelated to Doe Plaintiffs' personally identifying information.  The court notes that even while this matter was stayed during the pendency of Mr. Daleiden's appeal to the Ninth Circuit, the court retained jurisdiction to administer and enforce the preliminary injunction.  (*See* 1/4/17 Min. Entry (Dkt. # 109) ("Except for the court's administration and enforcement of the preliminary injunction . . . , this matter is stayed pending resolution of Mr. Daleiden's appeal.").)  Thus, to the extent that Mr. Daleiden believed that UW's redactions were more extensive than allowed under the court's preliminary injunction, he could have filed a motion seeking such relief at any time.  Indeed, he still can.